UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRENDA NIKKILA,<br><br>                  Plaintiff,<br><br>   vs.<br><br>ANDREW SAUL, Commissioner, Social Security Administration,<br><br>                  Defendant. | 5:19-CV-05059-DW<br><br><br>ORDER |

## INTRODUCTION

On August 7, 2019, claimant Brenda Nikkila filed a complaint appealing the final decision of the Commissioner of the Social Security Administration, finding her not disabled. (Doc. 1). The Commissioner denies claimant is entitled to benefits. (Doc. 5). The court issued a briefing schedule requiring the parties to file a joint statement of materials facts ("JSMF"). (Doc. 14). The Commissioner opposes the complaint in its entirety as well as the motion to reverse. (Doc. 20). For the reasons stated below, claimant's motion to reverse the decision of the Commissioner (Doc. 19) is granted.

## FACTS AND PROCEDURAL HISTORY

The parties' JSMF (Doc. 14) is incorporated by reference. Further recitation of the salient facts is incorporated in the discussion section of this order.

On December 20, 2016, Ms. Nikkila filed an application for Social Security disability benefits alleging an onset of disability date of September 1, 2016. (Doc. 14 at ¶ 1). The claim was initially denied, and Ms. Nikkila filed a Request for

Reconsideration on September 28, 2017, which was also denied. Id at ¶ 6.  Ms. Nikkila requested a hearing, and one was held on November 28, 2018.  Id. On March 13, 2019, the ALJ issued a written decision denying benefits.  Id. at ¶ 7. See also (AR at p. 33-40).[1]  Ms. Nikkila subsequently sought appellate review; her request was denied, making the decision of the ALJ final.  (AR at p. 1).  It is from this decision that Ms. Nikkila timely appeals.

The issue before this court is whether the ALJ's decision of March 13, 2019, that Ms. Nikkila was not "under a disability, as defined in the Social Security Act, from September 1, 2016, through [March 13, 2019]" is supported by substantial evidence on the record as a whole.  (AR at p. 34).  See also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.  The court reviews the Commissioner's decision to determine if an error of law was committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

---

[1] The court will cite to information in the administrative record as "AR at p. ___."

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 901 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision "'merely because substantial evidence would have supported an opposite decision.'" Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to benefits under Title XVI. 20 CFR § 416.920(a). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) Whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment – one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5)

> if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143–44 (8th Cir. 1998).  See also Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992) (the criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520 for disability insurance benefits).  The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.  (AR at pp. 35-40).  At step three of the evaluation, the ALJ found that Ms. Nikkila did not meet or medically exceed the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR at pp. 36-37).  At step four, the ALJ found Ms. Nikkila had the RFC to perform to her previous light work as a daycare worker.  (AR at pp. 37-40).  Thus, the ALJ found that Ms. Nikkila is not disabled.  (AR at p. 40).

## DISCUSSION

Ms. Nikkila identifies the following issues: 1) whether the ALJ's credibility determination is not supported by substantial evidence; 2) whether the ALJ erred in rejecting treating physician Dr. Trevor Anderson's opinions; 3) whether the ALJ's Residual Functional Capacity (RFC) finding is not supported by substantial evidence as the ALJ erred in rejecting Claimant's medical conditions of bilateral tarsal tunnel, carpal tunnel syndrome, urological disorders, asthma, obstructive sleep apnea, and Achilles tendonitis as not severe impairments; and 4) whether the ALJ erred in finding Claimant was not disabled under the Medical Vocational Guidelines commonly called "The Grids." (Doc. 19).

### STEP ONE

At step one, the ALJ determined Claimant "has not engaged in substantial gainful activity since September 1, 2016, the alleged onset date" of disability. (AR at p. 35).

### STEP TWO

At step two, the ALJ must decide whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. 20 CFR § 404.1520(c). A medically determinable impairment can only be established by an acceptable medical source. 20 CFR § 404.1513(a). Accepted medical sources include, among others, licensed physicians. Id. "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).

The regulations describe "severe impairment" in the negative. "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 CFR § 404.1521(a). Additionally, an impairment is not severe if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707. "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard...." Id. at 708 (internal citation omitted). Thus, a severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities.

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These

abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id. §§ 404.1521(b)(1–6), 416.921(b)(1–6); see Bowen v. Yuckert, 482 U.S. 137, 141, (1987).

The ALJ found Ms. Nikkila suffered from only one severe impairment: degenerative disk disease. (AR at 35). In making this finding, the ALJ found the following medically determinable impairments, independently and collectively, non-severe: obesity, diabetes mellitus; urinary tract disorder (urge incontinence, chronic interstitial cystitis); carpal tunnel syndrome; asthma; and obstructive sleep apnea. (AR at 36). The court will address these impairments in two categories: mobility restrictions and bladder issues.

**1.      Mobility and Other Physical Restrictions**

Ms. Nikkila asserts various physical impairments affecting her mobility, including recurrent Achilles tendonitis, bilateral tarsal tunnel, and bilateral diabetic neuropathy.  Generally, the ALJ determined Ms. Nikkila "has a normal gait and station and moves all her extremities normally, with normal strength, sensation, reflexes, and coordination." (AR at 36). He determined Ms. Nikkila's diabetes is controlled with medicine and that examinations do not show any significant indications of neuropathy. Id. He also rejected the claim of Achilles tendonitis because it had not been present for twelve months. Id. As such, he

6

found that none of these impairments, individually or collectively, significantly limited the claimant's physical ability to do basic work activities. Id.

Relating to these various impairments, Ms. Nikkila, through counsel, submitted additional evidence to the Appeals Counsel. The Appeals Counsel considered some of the evidence, but rejected the rest, stating it "does not show a reasonable probability that it would change the outcome of this decision." (AR at 2). The rejected medical records relating to these impairments include the following records: Black Hills Orthopedics from November 19, 2018, through January 11, 2019, (AR at 93-105); Fall River Health Services from October 30, 2018 through November 15, 2018, (AR at 106-120); Sioux San Hospital from October 28, 2005, through October 11, 2007, (AR at 157-173); Dr. Nathan Randall from January 9, 2014, through January 23, 2014, (AR at 145-156); and Black Hills Orthopedics from April 2, 2014, through July 28, 2014, (AR at 126-144).

These records, and the medical records initially considered, are replete with objective findings indicating long-standing issues involving Ms. Nikkila's mobility impairments. They establish the Achilles tendonitis has been a problem for Ms. Nikkila much longer than stated by the ALJ and show these problems significantly limit her physical ability to perform basic work.

Ms. Nikkila was seen at Sioux San Hospital in January 2007, complaining of burning pain and numbness in both feet and difficulty walking. (AR at 161-162). She was seen again in March 2007, complaining of similar symptoms. (AR at 164). At this time, the doctor diagnosed chronic bilateral foot pain caused by diabetic neuropathy. (AR at 165). She was referred to another doctor on April 12, 2007 and

7

received several steroid injections from 2007-2008 for bilateral tarsal tunnel. (AR at 166).

She was also seen by Dr. Daniel Palmer at Black Hills Orthopedic and Spine Center on April 2, 2014. (AR at 126). Dr. Palmer diagnosed Ms. Nikkila with, among other things, Achilles Bursitis or Tendinitis; Plantar Fascial Fibromatosis; Tarsal Tunnel Syndrome; and Tibial Tendonitis. (AR at 127). Ms. Nikkila was seen several more times throughout 2014 by Dr. Palmer. At first, he ordered physical therapy for her various ailments. (AR at 131). When physical therapy was not enough, Dr. Palmer ordered two different steroid shots to assist Ms. Nikkila with the pain. (AR at 141).

Ms. Nikkila met with Dr. Trevor Anderson initially on June 2, 2016, for an SI joint injection. (AR at 860). At her follow-up appointment, Ms. Nikkila complained of pain beginning in her back and extending into her right leg. On August 22, 2016, Dr. Anderson conducted a right lower extremity EMG, which showed a right L4 radiculopathy, right perineal neuropathy at the knee, mild peripheral neuropathy, and tibial neuropathy at the ankle. (AR at 581).

Ms. Nikkila saw Dr. Anderson again on March 12, 2018, complaining of general pain in her back and legs and numbness and shooting pain into her legs (AR at 976). He conducted another EMG on August 29, 2018, which showed chronic right L4 radiculopathy, right peroneal neuropathy at the knee, peripheral neuropathy, and likely bilateral tarsal tunnel syndrome. (AR at 1186). In response, Dr. Anderson performed trigger point injections on September 11, 2018. (AR at 1190). Ms. Nikkila experienced some short-term relief, but returned to Dr.

Anderson on October 2, 2018, at which time he ordered physical therapy. (AR at 1192-93).

A short time later, on November 14, 2018, Ms. Nikkila saw Dr. Ken Renaud for a broken toe she felt had not healed right. She also complained of burning and sharp pain in her Achilles tendon. (AR at 1247). Dr. Renaud ordered an X-ray of her right foot, which showed a large exostosis in the Achilles tendon at the posterior superior aspect of the calcaneus. (AR at 1248). Dr. Renaud diagnosed Ms. Nikkila with a displaced fracture of the proximal phalanx of the right great toe and tendonitis in her right Achilles tendon. Id.

Ms. Nikkila has also reported sudden and recurring numbness in her legs, which can lead to falls. Dr. Christian Lenger has recorded a number of these falls. (AR at 663-67, 644, 639, 629, 1228). Ms. Nikkila testified she was prescribed a cane to help her ambulate in 2016 to assist with these unpredictable falls. In August of 2016, Mrs. Nikkila was forced to close her home daycare, stating "I am no longer able to care for the children on my own due to the fact that I cannot lift them at all. I dropped my granddaughter trying to lift her. She only weighted 14 pounds." (AR at 334).

The court finds the substantial evidence in the record is contrary to the finding of the ALJ. The review of a decision to deny benefits "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barhnjhart, 471 F.3d 917, 920 (8th Cir. 2005). Keeping in mind that the claimant's burden to show severity is not an onerous requirement, the ALJ erred by concluding that claimant's

9

combination of physical impairments, namely her recurrent Achilles tendonitis, bilateral tarsal tunnel, and bilateral diabetic neuropathy, do not significantly limit her ability to do basic work activities.

Additionally, the records not considered by the Appeals Counsel constitute extensive evidence in support of Ms. Nikkila's claims and should be considered in determining whether these various impairments are to be considered severe. As such, the court also orders, pursuant to sentence four of 42 U.S.C. 405(g), that the additional evidence be considered on remand.

**2.   Bladder Issues**

Ms. Nikkila asserts various gynecological and urinary complications and conditions, including a urinary tract disorder, urge incontinence, chronic interstitial cystitis[2], and ongoing problems with her Medtronic implant[3]. In evaluating these claims, the ALJ determined the issue was non-severe in one sentence: "The evidence shows only mild complications for the urinary complaint." (AR at 36).

Ms. Nikkila's gynecological issues began as far back as 1995 and remain a constant concern. On July 14, 1995, Ms. Nikkila saw Dr. Marvin Buehner, a licensed Gynecologist, following the onset of vaginal wall prolapse and urinary

---

[2] Chronic interstitial cystitis is a chronic condition causing bladder pressure, bladder pain, and sometimes pelvic pain." This condition causes the bladder to send false signals to the brain, indicating the necessity to urinate when the bladder is not actually full. This causes those affected to have to urinate more frequently and in smaller quantities than normal. JSMF Addendum 1, p. 9.
[3] A Medtronic implant is a device that sends mild electrical impulses to the sacral nerves in an attempt to control the bladder and muscles assisting in urination. This is necessary when one's brain isn't communicating correctly with the sacral nerves, leading to symptoms of an overactive bladder. JSMF Addendum 1, p. 9.

10

stress incontinence caused by a lifting injury at work. JSMF at ¶ 16.[4] He recommended a cytometric exam, which was conducted shortly thereafter. (AR at 1067). Following the exam, Dr. Buehner scheduled Ms. Nikkila for a Pereyra vs Burch urethropexy. (AR at 1068). She underwent the surgery in September of 1995, but it only seemed to compound her issues. After her release from the hospital on September 22, 1995, she was seen on eight other occasions before March 21, 1996, complaining of pelvic pain radiating into the back, urge incontinence, and other post-operative pain. (AR at 1077-1081). At this time, she was recommended to Dr. Gerald Butz, a licensed Urologist, for severe urgency urge incontinence and moderate stress incontinence. (AR at 1086).

Around this same time period, Ms. Nikkila also began to see physiatrist Dr. Brett Lawlor for issues related to her lifting injury. She had recently changed employment and was now working as a front desk clerk at a motel, but was still feeling significant pain with lifting and sitting. (AR at 823). Dr. Lawlor assigned a permanent impairment due to her bladder issues and restricted her to working no more than 32 hours a week and 8 hours per day. (AR at 831).

Even with these restrictions, Ms. Nikkila had difficulty working as a front desk clerk and opened a home daycare in 1999. (AR at 70-71). She performed paperwork and supervised staff and was able to take care of some of the children's needs with the assistance of helpers. (AR at 328).

---

[4] The Commissioner disputes the materiality and the relevance of Ms. Nikkila's 1995 injury and subsequent treatment because they predate the time period at issue and she worked for almost 20 years after the injury, earning substantial gainful activity. JSMF at p. 4, fn. 1. This court will consider this evidence, as it forms the foundation for many of Ms. Nikkila's continuing issues and provides a fuller picture of the extent of her impairments.

In October 2001, Ms. Nikkila underwent another surgery, this time a urethral sling procedure performed by Dr. Buehner and an anterior colporrhaphy and a posterior colporrhaphy with a rectal sphincter repair performed by Dr. Butz. (AR at 1094-1095). Upon follow-up, Ms. Nikkila noted her fecal incontinence had improved, but she still had significant bladder difficulty and incontinence. On examination, Dr. Buehner discovered significant atrophy in her vaginal epithelium perineum. (AR at 1097). Despite this discovery, Ms. Nikkila continued trying to work at her day-care center, but was worried about the risk of vaginal prolapse recurrence. (AR at 1099). At this time, Dr. Buehner advised not to lift over 20 pounds for any period of time and that she would likely always have the risk of prolapse recurrence. Id.

Ms. Nikkila returned to Dr. Lawlor on May 7, 2002, complaining of continued incontinence. Dr. Lawlor also noted although her lifting restriction had been set at 20 pounds, she developed bleeding when lifting that amount of weight. (AR at 833). Accordingly, Dr. Lawlor changed her restriction to 5 pounds and decreased her working hours to 6 per day. Id.

Ms. Nikkila saw Dr. Buehner again in 2003, again complaining of urinary incontinence. He referred her to a different urologist this time, a Dr. Christopher Klinegele at the Mayo Clinic. (AR at 1100). Dr. Klinegele performed an abdominal sacrocolpopexy with rectus fascia to correct the vaginal prolapse and opined some of her pain may be caused by increased pelvic floor tension from her attempts to avoid incontinence. (AR at 1122).

In 2004, Ms. Nikkila was again referred to another urology specialist, Dr. Janet Smith. Dr. Smith diagnosed Ms. Nikkila with interstitial cystitis,

incontinence, urinary frequency, and pelvic pain. In August of 2005, Dr. Smith surgically implanted a Medtronic Interstim bladder device, similar to the one Ms. Nikkila continues to use to this day. (AR at 1156-1165).

Ms. Nikkila had no notable complications with the Interstim device until a couple of falls caused malfunctioning in the implant. (AR at 774). To address the issue, she saw Dr. Brian Lindeman on January 19, 2017. (AR 774-782). Dr. Lindeman noted the implant's battery was failing, the device had multiple high impedances, and the lead was broken. (AR at 777). Ms. Nikkila had surgery to implant a new Interstim device and remove the broken lead on April 21, 2017. (AR at 764-65).

The newly inserted implant did not last long. Ms. Nikkila started seeing Dr. Katherine Degen, gynecologist, on December 13, 2017 because of pain and leaking of large amounts of urine due to shocks received from the implant. (AR at 1015). Dr. Degen examined the implant and determined the device needed to be reprogrammed, as it had high impedances at multiple electrodes. (AR at 1022). Dr. Degen suggested Ms. Nikkila would need another lead revision due to these multiple complications with the device. At this time, Dr. Degen also assessed Ms. Nikkila with interstitial cystitis, a chronic condition causing bladder pressure, bladder pain, and pelvic pain. Id.

Dr. Degen performed the lead revision surgery on May 15, 2018. (AR at 1030-31). During the surgery, Dr. Degen noted another broken lead, but was unable to remove the distal 1 inch of electrodes. Id. Ms. Nikkila returned to Dr. Degen on May 31, 2018, complaining of pain at the site of the generator. AR at 1052). Dr. Degen diagnosed cellulitis at the site, and Ms. Nikkila received medical

care and antibiotics at Regional Health Wound Care to treat the infection. She also saw Dr. Degen on June 1, 2018, complaining that the site was hot and causing her pain. (AR at 1059). Dr. Degen warned her to be cautious, as the multiple surgeries and the implant made her more susceptible to MRSA. Id.

The failure of the ALJ to find Ms. Nikkila's gynecological and bladder issues as a severe impairment constitutes an error as a matter of law. Keeping in the mind that the claimant's burden to show severity is not an onerous requirement, it is clear from the record that these impairments significantly limit Ms. Nikkila's physical ability to do basic work activities. Considering the evidence that "fairly detracts from [the] decision[,]" the court finds that substantial evidence does not support the ALJ's determination. The court finds the ALJ erred in determining Ms. Nikkila's combination of impairments relating to her mobility and bladder were non-severe.

The failure to identify all of a claimant's severe impairments impacts not only the ALJ's credibility finding and consideration of activities of daily living, but also, most importantly, the claimant's residual functional capacity ("RFC"). "[F]ailure to consider plaintiff's limitations . . . infect[s] the ALJ's . . . further analysis under step four." Spicer v. Barnhart, 64 Fed. Appx. 173, 178 (10th Cir. 2003).

**ORDER**

Based on the above analysis, it is hereby

ORDERED that claimant's motion to reverse the decision of the Commissioner (Doc. 19) is granted. It is further

ORDERED that, pursuant to sentence four of 42 U.S.C. § 405(g), the case is remanded to the Commissioner for rehearing consistent with this decision.

DATED this 30th day of November, 2020.

BY THE COURT:

DANETA WOLLMANN
UNITED STATES MAGISTRATE JUDGE